38 A.3d 534

**Harold William PURNELL, et al**

v.

**BEARD & BONE, LLC.**

**No. 1861, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

March 1, 2012.

496

498

500

Demetrios G. Kaouris (Miles & Stockbridge, P.C., on the brief) Easton, MD, for appellant.

Robert A. Benson (Alison I. Getty, Cullen, Insley & Benson, LLP, on the brief) Salisbury, MD, for appellee.

Panel: ZARNOCH, HOTTEN and J. FREDERICK SHARER (Retired, Specially Assigned), JJ.

SHARER, J.

Appellee, Beard and Bone, LLC, (Beard & Bone) filed a complaint to quiet title and for declaratory judgment against Mary Ann Cantwell (Cantwell) in the Circuit Court for Worcester County. Beard & Bone later filed an amended complaint, which added appellants, the Estate of Helen Marie Brittingham Purnell, Marion Purnell Smith, Harold William Purnell, and Eunice Purnell Williams (the Purnells), as parties. Beard & Bone, which owned a landlocked parcel of land, sought an easement by necessity over and across the properties of Cantwell and the Purnells, both of which bordered a public road.

The trial court ruled that an easement by necessity had been created in 1918 and that the easement still existed. Thus, the trial court granted Beard & Bone a 12–foot easement, with half over and across the northern most six feet of the Cantwell property and the other half over and across the southern most six feet of the Purnell property.[1]

In their timely appeal, the Purnells present the following questions for our review, which we have slightly rephrased:[2]

1. Was an easement by necessity created over the Purnell property where it was the first property conveyed from a common grantor, and was not the cause of the Beard & Bone property being landlocked?

---

1. Other than suggesting that the easement ought to lie exclusively on the Cantwell property, appellants do not challenge the trial court's determination of the width or location of the easement.

2. Cantwell is not a party to this appeal.

2. Was there sufficient evidence of an apparent use of the purported easement to establish an implied easement by reservation?

3. Was the alleged easement by necessity over the Purnell property abandoned or extinguished by adverse possession?

4. Does the doctrine of laches preclude Beard & Bone from seeking to establish an easement by necessity?

For the reasons discussed, we shall affirm the judgment of the circuit court.

## BACKGROUND

The Beard & Bone property consists of approximately 51 acres located west of Evans Road, a public road in Worcester County. It was acquired by Beard & Bone at auction in 2007. The property had been used for timber and hunting. John Andrews, a registered land surveyor, surveyed the Beard & Bone, Cantwell, and Purnell properties, and other nearby properties, and determined that the Beard & Bone property did not connect to a public road or to any private roads with access to a public road. The Cantwell and Purnell properties, which are contiguous along their respective northern and southern boundaries, are located to the east of the Beard & Bone property and thus lie between the Beard & Bone property and Evans Road. Andrews testified that the most direct or reasonable route to access a public road from the Beard & Bone property was across the Purnell and Cantwell properties. He explained that the right of way would have to be 12 to 14 feet wide because if the timber were to be harvested from the Beard & Bone property, the "timber trucks are going to need every bit of that."

Susan Pusey, qualified as an expert in title abstracting, testified that she prepared chains of title for the Beard & Bone, Cantwell, and Purnell properties. All three properties were originally owned by James Givans as one parcel. Givans transferred the entire tract to Orlando Harrison and George A. Harrison (the Harrisons). On July 19, 1918, the Harrisons divided the parcel, selling off the Purnell property to the

Purnells' predecessor in title and the Cantwell property to Cantwell's predecessor in title. The Harrisons retained, *inter alia,* what is now the Beard & Bone property. There was evidence that the Harrisons later operated a nursery on the property, because in 1929 they transferred the present Beard & Bone property to Harrisons' Nurseries, Inc.

The deeds conveying the Purnell and Cantwell properties were executed and dated the same day—July 19, 1918. They were also recorded in the same book but, of necessity, one recording preceded the other. That is, the Purnell deed was recorded at page 303 of the deed book, and the Cantwell deed was recorded at page 307. Neither deed reserved any express right of way or easement allowing the Harrisons, or their successors in title, to access a public road across the Purnell or Cantwell properties.

Richard Rice, an owner of Beard & Bone, testified that the Beard & Bone property was landlocked. Rice stated that when Beard & Bone bought the property at auction, he was aware that there were problems with access. Rice had attempted, unsuccessfully, to obtain a right of way from a neighbor to the north. The Beard & Bone property is subject to a conservation easement and its current uses are limited to timber and hunting. Rice stated that the requested 14-foot easement across the Purnell and Cantwell properties was the shortest route to a public road.

The current owners of the Purnell property acquired title in 2008 through the estate of their mother, Helen Marie Brittingham Purnell who, as a tenant by the entirety with her late husband, acquired title in 1951. Harold Purnell, one of the current owners, testified that he has been farming the property for about 50 years and has been familiar with the Purnell property his entire life. He stated that he went by the Purnell property "maybe daily[,]" farmed the ten acres of cleared land on the property, and leased out the wooded acreage to hunters.

Harold Purnell testified that he had never seen anyone access the Beard & Bone property through the Purnell prop-

erty or by any road, path, or trail across the Purnell Property. He added that "no trespassing" signs were posted at the front of the Purnell property along Evans Road and that the entrances to the Purnell property had chains across them. Harold Purnell further testified that the timber had been cut from the Beard & Bone property "about ten years ago" and that access was gained through the Widgeon property, to the north, and not across the Purnell property. He added that a drainage ditch was located on the Purnell property line where Beard & Bone wanted to place the easement.

Calvin Purnell, Harold Purnell's son, testified that he had helped his father farm the Purnell property for the past 20 years. During that time, he would go by the property three or four times per week. Calvin Purnell also recalled that he had never seen anyone access the Beard & Bone property from the Purnell property, or seen any indication on the Purnell property that someone was using it to access the Beard & Bone property. He also stated that "no trespassing" signs were posted on the Purnell property.

Dawn Webb testified that she had been the immediate predecessor in title to Beard & Bone. She stated that the property did not have access to a public road and that it was made clear to all potential purchasers that the property was landlocked. She added that her father, from whom she acquired title, had cut the timber on the property several years ago, but that he had not gained access to the property by crossing the Purnell property. Webb also testified that as far as she knew, her father had never gained access by crossing the Purnell property. Webb had never been on the property when her father owned it, or when she owned it.

Cantwell testified that she had been familiar with the Cantwell property all of her 51 years and that no one had ever accessed the Beard & Bone property by crossing the Cantwell property.

### Standard of Review

This Court, in *Rau v. Collins*, 167 Md.App. 176, 184–85, 891 A.2d 1175 (2006), set forth the relevant standard of review:

When, as in the case at bar, an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses. Maryland Rule 8–131.

### *Easements by Necessity*

 Resolution of this appeal implicates the doctrine of easements by necessity. "An easement is broadly defined as a nonpossessory interest in the real property of another...." *Boucher v. Boyer*, 301 Md. 679, 688, 484 A.2d 630 (1984) (citations omitted). "In general, the terms 'easement' and 'right-of-way' are regarded as synonymous." *Miller v. Kirkpatrick*, 377 Md. 335, 349, 833 A.2d 536 (2003) (citation omitted). "An easement may be created by express grant, by reservation in a conveyance of land, or by implication." *Kobrine L.L. C. v. Metzger*, 380 Md. 620, 635, 846 A.2d 403 (2004).

 At issue in the present case is a form of implied easement, an easement by necessity. *See Hancock v. Henderson*, 236 Md. 98, 102, 202 A.2d 599 (1964) ("Ways by necessity are a special class of implied grants and have been recognized in this State for a good many years.") "[I]mplied easements by necessity arise from a presumption that the party needing the easement should have access over the land." *Calvert Joint Venture #140 v. Snider*, 373 Md. 18, 39–40, 816 A.2d 854 (2003). The doctrine of easements by necessity "is based upon public policy, which is favorable to full utilization of land and the presumption that parties do not intend to render land unfit for occupancy." *Condry v. Laurie*, 184 Md. 317, 321, 41 A.2d 66 (1945); *see also Rau v. Collins*, 167 Md.App. 176, 186, 891 A.2d 1175 (2006) (citations omitted) ("Full utilization of land is favored, and it is presumed that parties do not intend to render conveyed property unfit for occupancy.") Recently, in *Sharp v. Downey*, 197 Md.App. 123, 167, 13 A.3d 1 (2010), *cert. granted*, 419 Md. 646, 20 A.3d 115 (2011) (footnote omitted), this Court explained:

The public policy exists in recognition that to allow a landlocked parcel inadvertently to be created affects not only the initial owner of that parcel, but every subsequent owner as well. By cutting off the land from all access to public ways, landlocking a parcel renders the land unuseable for virtually any future purpose.

Despite this public policy, "the law does not prohibit one from cutting himself off from all access to his land." *Shpak v. Oletsky,* 280 Md. 355, 364–65, 373 A.2d 1234 (1977) (citation omitted).

"The determination that the parcels were once a unitary tract of land and owned by a common grantor is critical to finding an implied easement by necessity." *Rau,* 167 Md.App. at 190, 891 A.2d 1175. Stated another way, "[i]n order to establish a right of way of necessity, it must be shown that sometime in the past the land for the benefit of which the easement is claimed and that over which it is claimed belonged to the same person." *Michael v. Needham,* 39 Md.App. 271, 275, 384 A.2d 473 (1978) (citation omitted); *see also Shpak,* 280 Md. at 361, 373 A.2d 1234 ("An easement by implied reservation must arise at a time when there is unity of title.") (Citations omitted); *Oliver v. Hook,* 47 Md. 301, 310 (1877) ("[A] right of way of necessity can only be raised out of the land granted or reserved by the grantor, and never out of the land of a stranger.")

There are two types of easements of necessity, implied reservation and implied grant. *Shpak,* 280 Md. at 360, 373 A.2d 1234. "[G]rants of easements by implication are looked upon with jealousy and are construed with strictness by the courts." *Condry,* 184 Md. at 321, 41 A.2d 66 (citation omitted). The case before us involves an easement by implied reservation, and "[t]he rule with respect to implied reservations is much more strict than that with respect to implied grants." *Hansel v. Collins,* 180 Md. 209, 215, 23 A.2d 686 (1942). "It is only in cases of the strictest necessity, and where it would not be reasonable to suppose that the parties intended the contrary, that the principle of *implied* reserva-

tion can be invoked." *Burns v. Gallagher,* 62 Md. 462, 472 (1884) (emphasis in original and citations omitted); *see also Mitchell v. Houstle,* 217 Md. 259, 264, 142 A.2d 556 (1958) ("From a very early date, a distinction has been made between an implied grant and an implied reservation, with the rule being much more strict when called upon to create an easement by implied reservation than to create one by implied grant.") In *McTavish v. Carroll,* 7 Md. 352, 359 (1855), the Court of Appeals set forth the basic contours of an easement by implied reservation: "[W]here a man owns two closes, A and B, with a road from A over B, to the highway, and he sells close B, without reserving, in the deed, any right of way, if he has no other road, he may use the one over B as a way of necessity."

Although this language of strictness is used in regard to easements by implied reservation, "Maryland has accepted the general rule that where there is a grant of land without any express reservation of an easement, a reservation is implied if the easement is reasonably necessary for the fair enjoyment of the property." *Greenwalt v. McCardell,* 178 Md. 132, 138, 12 A.2d 522 (1940) (citations omitted). The Court of Appeals has also described the required necessity to be "imperative and absolute," *Shpak,* 280 Md. at 361, 373 A.2d 1234 (citations omitted), but then explained the importance of the intention of the parties:

> " 'It is not the necessity which creates the right of way, but the fair construction of the acts of the parties.' The necessity merely furnishes evidence as to the real intention of the parties. 'For the law will not presume that it was the intention of the parties that one should convey land to the other in such manner that the grantee could derive no benefit from the conveyance; nor that he should so convey a portion as to deprive himself of the enjoyment of the remainder. The law under such circumstances will give effect to the grant according to the presumed intent of the parties.' "

*Shpak,* 280 Md. at 361–62, 373 A.2d 1234 (quoting L. Jones, Easements § 304 at 250) (footnotes omitted).

■ In other words, "an implied easement is based on the presumed intention of the parties at the time of the grant or reservation as disclosed from the surrounding circumstances rather than on the language of the deed." *Boucher,* 301 Md. at 688, 484 A.2d 630 (citation omitted). Thus, the necessity does not give rise to the easement; instead, it serves as evidence of the parties' intentions. *Rau,* 167 Md.App. at 190, 891 A.2d 1175 (citation omitted); *see also Koch v. Strathmeyer,* 357 Md. 193, 198, 742 A.2d 946 (1999) ("The standard of proof necessary to establish an implied easement . . . is the 'clear manifestation' of the intent of the common grantor.") (Quoting *Williams Realty Co. v. Robey,* 175 Md. 532, 539, 2 A.2d 683 (1938)); *Greenwalt,* 178 Md. at 139, 12 A.2d 522 ("Necessity of itself does not create a right of way; it is merely a fact offered in evidence to show an intention to establish a right of way by raising the presumption of a grant.")

■ In order to ascertain the intention of the parties, courts may consider extraneous factors. *Boucher,* 301 Md. at 688, 484 A.2d 630. "Intention 'is a question of fact,' and the surrounding circumstances of the case must be analyzed in order to truly understand an unexpressed intention." *Koch,* 357 Md. at 198, 742 A.2d 946 (quoting *Scholtes v. McColgan,* 184 Md. 480, 489, 41 A.2d 479 (1945)) (one citation omitted). *But see Stansbury v. MDR Development, L.L.C.,* 390 Md. 476, 489, 889 A.2d 403 (2006) (" 'The intent to create the easement is . . . deemed to be shown by the type of transaction involved, and no other evidence is necessary to establish the intent of the parties to create a way of necessity.' ") (Quoting 3 Herbert T. Tiffany, *The Law of Real Property,* § 793 (3rd ed.1939, 2004 Supp.)).

■ Further, the implied reservation is based on the intention of the parties at the time of the conveyance. *See Boucher,* 301 Md. at 688, 484 A.2d 630 ("An implied easement is based on the presumed intention of the parties at the time

of the grant or reservation as disclosed from the surrounding circumstances rather than on the language of the deed.") (Citation omitted); *Hancock v. Henderson*, 236 Md. 98, 102, 202 A.2d 599 (1964) ("[R]emote grantees . . . cannot create the way of necessity. If the way of necessity was not implied at the time of the [original] grant . . . , it cannot be established by a subsequent necessity. In other words, the necessity must be determined from the conditions as they existed at the time of the conveyance.") (Citations omitted); *Feldstein v. Segall*, 198 Md. 285, 294, 81 A.2d 610 (1951) ("If a way of necessity is not implied in the grant, it cannot be established by any subsequent necessity."); *see also Shpak*, 280 Md. at 356, 373 A.2d 1234 ("the date for determining whether a way of necessity was created by an implied reservation was that of the contract between the original parties and not that of the ultimate deed. . . ."); *Michael*, 39 Md.App. at 277–78, 384 A.2d 473 (relying on *Shpak* to conclude that the date for determining whether a way of necessity was created was that of the contract between the original parties and not the date of the deed or the date of recordation).

 The easement also passes with each conveyance to subsequent grantees. *Hancock*, 236 Md. at 105, 202 A.2d 599. As a result, "a remote grantee of land not being used at the time of severance may nevertheless, when the use becomes necessary to the enjoyment of his property, claim the easement under his remote deed." *Id.* (citation omitted). In other words, "non-use alone is not sufficient to extinguish a way by necessity." *Id.* (citation omitted). "Easements by necessity normally cease to exist when the necessity for the easement ceases." *Stansbury*, 390 Md. at 491, 889 A.2d 403 (citation omitted).

As a preamble to our resolution of the issues before us, we have engaged in a lengthy discussion of the concept of easements by necessity. The Court of Appeals has succinctly set forth the three basic requirements:

The prerequisites to the creation of an easement by necessity can be summed up in three parts: (1) initial unity

of title of the parcels of real property in question; (2) severance of the unity of title by conveyance of one of the parcels; and (3) the easement must be necessary in order for the grantor or grantee of the property in question to be able to access his or her land, with the necessity existing both at the time of the severance of title and at the time of the exercise of the easement.

*Stansbury,* 390 Md. at 489, 889 A.2d 403.

### DISCUSSION

*1. Implied easement by necessity—the Purnell and Cantwell properties*

The Purnells deny the existence of an easement. That is so, they assert, because when the deed conveying the Purnell property to their predecessor in title was recorded, the Beard & Bone property and the Cantwell property were still under common ownership. According to the Purnells, it was only when the deed to the Cantwell property was recorded, *i.e.,* the Cantwell property was severed from the property retained by the Harrisons, that an easement of necessity arose because the Beard & Bone property then became landlocked.

The Purnells thus claim that it was the Harrisons' conveyance of the Cantwell property that caused the Beard & Bone property to become landlocked. They contend that because the Harrison–Cantwell deed was recorded later than the Harrison–Purnell deed, the Cantwell property was conveyed subsequent to the Purnell property. As a result, they posit, any easement by necessity exists only over the Cantwell property. The Purnells refer us to *Stair v. Miller,* 52 Md.App. 108, 447 A.2d 109 (1982), which we discuss, *infra,* in support of their position.

The Purnells allege that, in the absence of any evidence as to when the parties contracted, the time of recording of the deed controls the severance.[3] Thus, they assert, because the

---

3. See, Md.Code, Real Property, § 3–203 "Subsequent deed; priority of deed first recorded."

deed to the Purnell property was recorded before the deed to the Cantwell property, an easement, to the extent that it exists in favor of Beard & Bone, exists exclusively over the Cantwell property.

Beard & Bone contends that the Harrisons' unity of title in the three properties was severed on July 19, 1918, by the separate Purnell and Cantwell deeds. Beard & Bone asserts that the fact that the Harrison–Purnell deed was recorded four pages prior to the Harrison–Cantwell deed does not indicate an intent by the Harrisons to have established a conveyance priority. Beard & Bone claims that the Purnells presented no evidence sufficient to demonstrate that the Purnell property was intentionally conveyed and recorded prior to the Cantwell property, or that the easement by necessity could not exist over the Purnell property.

Beard & Bone argues that *Stair, supra,* is inapposite to the present case because, unlike *Stair,* the Cantwell and Purnell properties were conveyed on the same day and, as found by the trial court, the Harrisons' unity of title was severed by those conveyances on July 19, 1918.

The Purnells respond that *Stair* stands for the proposition that the first property transferred by a common grantor and recorded among the land records cannot be subject to an easement by necessity, relying on the order of recordation, which placed the Purnell deed in the Land Record book before the Cantwell deed. The Purnells argue that when a deed is recorded, the property is deemed to be transferred, even if the deed is dated the same day as the deed to another property from a common grantor. According to the Purnells, the first property conveyed from a common grantor and recorded could not be subject to an easement by necessity.

The Purnells also note that Maryland is a race-notice jurisdiction. Thus, they claim, the Purnell deed, which was recorded first, would take priority over the Cantwell deed, recorded later, albeit in the same book on the same day. That fact, they assert, defeats an easement by necessity.

In granting an easement by necessity in favor of the Beard & Bone property, the Circuit Court issued a written Opinion and Order, which provided in relevant part:

The Harrisons, as original grantors, severed the original parcel into three parcels on July 19, 1918. Two parcels were conveyed to [the Purnells' and Cantwell's] predecessors in title and the other was retained by the Harrisons, for their own use. [Beard & Bone] now owns the parcel originally retained by the Harrisons. Neither deed expressly reserved any access for the Harrisons, as grantors, to or from [Beard & Bone's] parcel through the lands of [the Purnells and Cantwell]. Therefore, this Court will only address the issue of whether the Harrisons, as original grantors, reserved unto themselves an easement of necessity by implied reservation.

\* \* \*

This Court finds that the requisite unity of title existed when the three parcels were owned as one by the Harrisons. On July 19, 1918, the Harrisons conveyed two parcels by deed and retained one parcel for themselves. The Purnell[s']\[ \] counsel argues that because the Purnell[s']\[ \] deed was recorded four pages prior to \[ \] Cantwell's no unity of title existed. However, both deeds were executed on July 19, 1918. The fact that one deed was recorded four pages earlier than the other evidences nothing more than a possible shuffling of pages by the clerk. Ultimately, both parcels were conveyed on July 19, 1918 and there was unity of title when the parcels at issue here were conveyed by the Harrisons.

\* \* \*

As to the necessity of the easement, there is no dispute that the property is currently landlocked, with no access to any public road. At the time of severance of the parcels, [Beard & Bone's] parcel was retained by the original grantor, the Harrisons, who must have had some access to and from the parcel, as there was testimony that the Harrisons operated a nursery at one time on the property. No

testimony was provided as to where or what access entailed, but this Court finds that the Harrisons did not intend that the parcel be landlocked.

It is certainly possible that the Widgeon property was the means utilized by the Harrisons and future title holders up to the point where the Widgeons revoked whatever right they had granted to [Beard & Bone's] predecessor in title. However, what [Beard & Bone's] predecessors may or may not have had with respect to the Widgeon property [the property to the north of the Beard & Bone Property] is not before this Court, and an easement by necessity cannot be granted through the lands of a stranger who does not share a common grantor. . . .

Any license or otherwise that [Beard & Bone's] predecessors in title might have enjoyed as a means of ingress and egress through the Widgeon property is not before this Court and has apparently been revoked, as evidenced by Dorothy Widgeon's statement that she would not allow access [through] her property. Any remnants of a dirt road that may or may not have provided access to [Beard & Bone's] parcel have long since been stolen back by time and no one can remember for certain if it was even there to begin with or if it provided access to a public road. Additionally, it appears that any dirt road that existed may have run through the lands of a party that did not share a common grantor with [Beard & Bone's] parcel.

Therefore, this Court finds that a strict necessity existed at the time of severance and exists today, as [Beard & Bone's] parcel currently has no access to a public road. Regardless of any licensed, or otherwise, access to the parcel the Harrisons or their future title holders might have shared at the time of severance of the parcels, this Court finds that the necessity was created at the time of the severance of the parcels at issue.

\* \* \*

Unfortunately, the parties to the original deeds are no longer alive to shed light on the location of any easement as

it existed at the time of severance of the parcels. Therefore, we have no testimony or evidence of whether any easement was apparent at the time of the original severance. It is possible that the Harrisons and [the Purnells' and Cantwell's] predecessors in title were aware of and could locate an easement by necessity that was apparent and existed at the time of the severance. Admittedly, the reverse could also be true.

[The Purnells and Cantwell] testified, some remembering as far back as 50 years ago that as long as they could remember, no road or path has ever run through their parcels to the benefit of [Beard & Bone's] parcel. In fact, no one was able to produce any evidence as to how [Beard & Bone's] predecessors in title accessed the parcel other than by testimony from more recent memory, which showed that the parcel was accessed through the lands of the Widgeons for removing timber. No surveys were done of [ ] Cantwell's parcel or of the Purnell['s] parcel. This Court cannot speculate as to whether such surveys would have produced any evidence to support either an argument for or against the location of an easement. Still, this Court presumes that the Harrisons, as original grantor, did not intend to lock their property out from means of access to a public road.

While this Court is mindful that [Beard & Bone] purchased the parcel knowing that access to the property was undefined and may be landlocked, the Court does not find such acknowledgment dispositive of [its] claim. It seems wholly unrealistic and unreasonable to this Court that the Harrisons intended [Beard & Bone's] parcel be landlocked with no access, especially considering that the parcel had once been a nursery.

Turning, finally, to the location of the easement, because this Court finds that the three parcels were severed on the same day, this Court believes that the most fair and equitable resolution is for both Defendants' parcels to share the burden of the easement. Therefore, this Court shall grant [Beard & Bone] a twelve-foot easement, with conditions,

through the [Purnell and Cantwell] parcels, which burden shall be shared equally. . . .

 The intentions of the common grantor control the creation, or non-creation, of an easement of necessity. If a common grantor conveys the two parcels of his or her property on the same date, the ability of one grantee to record the deed prior to that of the other grantee would frustrate the intentions of the parties. The Purnells' suggestion that we consider the page on which the deeds were recorded to determine that the properties were not severed at the same time would frustrate the intentions of the common grantor, absent credible evidence to the contrary.

Other than the recorded deeds, there are no documents, such as a contract of sale or other memoranda, from which the court might infer intent. As we have noted, the deeds were executed on the same date and subsequently recorded, again on the same date. Of necessity, when both deeds were presented to the land records clerk one would naturally precede the other in the deed book—if for no other reason than by whim of the clerk. Absent other evidence, we cannot agree with the Purnells' conclusion that the order of recordation bears on the intent of the parties.

In *Stair*, Miller owned a six-acre parcel without road frontage. *Id.* at 109. Two properties, one owned by Stair and another owned by a third party, Koontz, separated the Miller property from two public roads. *Id.* The circuit court granted Miller a right of way over the Stair property. *Id.* On appeal, Stair claimed that the circuit court erred in granting an easement of necessity over the Stair property when there was a right-of-way then existing over the Koontz property. *Id.* We concluded that the circuit court had committed no error and explained:

Although all the properties herein involved were at one time owned by a single ownership, the Koontz land was sold off prior to that of the lands of the remaining parties hereto and at that time all parcels had road frontage; therefore,

there can be no right-of-way by necessity over the Koontz land.

*Id.* at 110 (citations omitted).

*Stair* offers the Purnells no relief because the recordation date had no impact on our decision in that case. Rather, the import was that the Koontz property had been sold off before the Miller and Stair properties. In the present case, the Purnell and Cantwell properties were conveyed on the same day. There is simply no indication that the Purnell property was conveyed prior to the Cantwell property, or that the order of recordation established a priority. We have not uncovered a single easement-by-necessity case in which the court relied not just on the date of recordation, but the page in the deed book in which the deed was recorded to determine the order of severance of the parcels. Nor, do the Purnells refer us to any such case.

Indeed, in *Michael v. Needham,* 39 Md.App. 271, 384 A.2d 473 (1978), we declined to consider the date of recordation in determining when the way of necessity arose. *Id.* at 277, 384 A.2d 473. There, the deed was recorded more than eight years after the contract for the sale of the property. *Id.* We explained that if we relied on the date of recordation,

we would be required to determine that the right of way arose, if at all, by reason of an implied reservation of the easement rather than by implied grant, and we would be required to test the creation of the right of way by the stricter standard of necessity.

*Id.*

In addition, we relied on *Shpak, supra,* in which the Court of Appeals determined that the date of the contract controlled for determining whether a way by necessity was created by implied reservation. *Id.* at 277–78, 384 A.2d 473. *See Shpak,* 280 Md. at 356, 373 A.2d 1234 ("the date for determining whether a way of necessity was created by an implied reservation as that of the contract between the original parties and not that of the ultimate deed which came after a period of litigation.")

Easements of necessity are determined from conditions that existed at the time of the conveyance. *See Mitchell v. Seipel*, 53 Md. 251, 274 (1880) ("Whether it is a way of necessity or not, must depend upon the state of things existing at the date of the deed....") There was no evidence before the circuit court that could result in a conclusion that any date other than July 18, 1918, is relevant to the determination of the easement. We conclude that the trial court committed no error in ruling that the Purnell and Cantwell properties were conveyed at the same time, which severed the unity of title held by the Harrisons.

### 2. Sufficiency of the evidence, vis a vis, the Purnell property

The Purnells' tack was to limit the easement, if in fact the court found the existence of an easement, to the Cantwell property. They assert that the trial court erred in finding that there was an easement by necessity because there was no evidence that the easement was apparent in 1918 at the time the unity of the Harrison tract was severed. According to the Purnells, the Court of Appeals made clear in *Burns v. Gallagher*, 62 Md. 462 (1884), that an easement by implied reservation must be apparent at the time of its creation. They note that the easement is not apparent today and that there was no evidence demonstrating that the Beard & Bone property was ever accessed through the Purnell property. In essence, they argue that "apparent" means physically or visually apparent on the ground.

They contend that *Hancock v. Henderson*, 236 Md. 98, 202 A.2d 599 (1964), is distinguishable because the easement of necessity at issue there was one of implied grant and not implied reservation. Further, in *Hancock*, there was evidence of a road over the servient property.

Beard & Bone responds that the trial court correctly found the three requirements for the existence of an easement: (1) unity of title; (2) severance of that original unity of title by the conveyances to Purnell and Cantwell; and (3) the easement

was necessary for the Harrisons to have continued access to their remaining parcel. In any event, Beard & Bone assert that the evidence was sufficient to establish that the easement satisfied the "apparent" requirement at the time of its creation. Beard & Bone posits that the easement was apparent because an examination of the property would have revealed that the Beard & Bone property was landlocked. Beard & Bone claims also that an examination of the Harrisons' retained property at the time of severance would have revealed a lack of access to a public road and the necessity for an easement.

Beard & Bone also asserts that the Purnells' argument that the easement be apparent at the time of its creation ignores the public policy underlying easements by necessity, *i.e.,* favoring full utilization of land and the presumption that parties do not intend to render land unfit for occupancy. Thus, Beard & Bone concludes that the trial court committed no error in recognizing the easement by implied reservation, relying on *Hancock v. Henderson,* 236 Md. 98, 202 A.2d 599 (1964), in support of its position.

In *Burns v. Gallagher,* 62 Md. 462, 470–71 (1884), the easements in question, an alley and a drain, were, at the time of the conveyances, "in existence, open and apparent, and in constant use" until one of the successors in title closed the alley and obstructed the drain. The question before the Court of Appeals was

> "whether the defendants [who had blocked the alley and obstructed the drain] took their lot subject to the long existing, open and apparent *quasi* easement or servitude, for the benefit of the adjoining lot previously purchased by the party under whom the plaintiffs [the defendants' neighbors who were blocked from using the alley and whose drain was obstructed] claim?"

The properties had once been held by a common grantor, who had retained the defendants' property when he conveyed the plaintiffs' property. *Id.* at 469–70.

To be sure, in *Burns,* 62 Md. at 471–72, the Court of Appeals explained:

For the principle is well settled, and it is founded in reason and good sense, that no easement or *quasi* easement can be taken as reserved by implication, unless it be *de facto* annexed and in use at the time of the grant, and it be shown moreover to be *actually necessary* to the enjoyment of the estate or parcel retained by the grantor. And such necessity cannot be deemed to exist if a similar way or easement may be secured by reasonable trouble and expense, and especially not if the necessary way or easement can be provided through the grantor's own property. In order to give rise to the presumption of a reservation of an existing easement or *quasi* easement, where the deed is silent upon the subject, the necessity must be of such strict nature as to leave no room for doubt of the intention of the parties that the adjoining properties should continue to be used and enjoyed, in respect to existing easements or *quasi* easements, as before the severance of ownership; for otherwise parties would never know the real purport of their deeds.

At issue in *Burns* was, in part, an implied grant of an easement or *quasi* easement. *Id.* at 473–74. The Court stated:

The general principle of law is, that where a person makes a grant or conveyance of property he impliedly grants that also which is necessary to make the grant or conveyance of the principal subject effectual and beneficial; and in this case we must suppose that it was the intention, as doubtless it was the expectation, of the parties, that the premises sold and transferred to [the plaintiffs' predecessor in title] should be used and enjoyed with the same easements and privileges with which they had previously been used and were then enjoyed.

*Id.* at 473. Thus, it was unlawful for the common grantor's successor in title to block the alley or obstruct the drain. *Id.* at 474.

In *Hancock v. Henderson,* 236 Md. 98, 202 A.2d 599 (1964), William Gaton owned approximately 180 acres and, in 1898, conveyed 31 acres, which did not adjoin a public road, to Eliza Hutchins. *Id.* at 100, 202 A.2d 599. The only use made of the 31 acres, called Little Woods, was for timber and firewood. *Id.* The Hendersons were Hutchins' successors in title, and the Hancocks were Gaton's successors in title. *Id.* A roadway ran through the Hancocks' land to the Hendersons' tract, and the Hendersons claimed the roadway as an easement. *Id.* The Hendersons were not able to prove that the roadway was in existence at the time of the 1898 conveyance. *Id.* The earliest use of the roadway was shown to be in 1911. *Id.*

The Court of Appeals concluded that because the Hendersons had failed to prove that the roadway was in existence at the time of the 1898 conveyance, their claim of an easement by express grant failed. *Id.* at 102, 202 A.2d 599. The Court then considered whether the Hendersons had a way of necessity. *Id.* The Court stated: "We have said the doctrine of easements by necessity is based upon a public policy favoring full utilization of land and a presumption the parties do not intend the land conveyed be rendered unfit for occupancy." *Id.* at 103–04, 202 A.2d 599.

In concluding that an easement of necessity existed, the Court of Appeals wrote:

> As in *Condry v. Laurie, supra,* we are dealing with the rights and obligations of subsequent title holders of both the alleged dominant and servient properties. The Hendersons, as remote grantees, cannot create the way of necessity. If the way of necessity was not implied at the time of the grant in 1898, it cannot be established by a subsequent necessity. *Feldstein v. Segall,* 198 Md. 285, 294, 81 A.2d 610; 28 C.J.S., *Easements,* Section 35 b. In other words, the necessity must be determined from the conditions as they existed at the time of the conveyance. In the first *Condry v. Laurie* case [4] we held that a personal license in the deed did not negate

---

4. In the first *Condry* case, 184 Md. 317, 41 A.2d 66 (1945), the Court of Appeals reversed and remanded the case to give the parties the oppor-

a way of necessity, but the occasion for using the way was deferred until expiration of the license, the necessity having been in existence at the time of the grant. The theory is that such an easement, being appurtenant, passes with each conveyance to subsequent grantees. *Douglass v. Riggin,* 123 Md. 18, 23, 90 A. 1000. Hence a remote grantee of land not being used at the time of severance may nevertheless, when the use becomes necessary to the enjoyment of his property, claim the easement under his remote deed. *See Finn v. Williams,* 376 Ill. 95, 33 N.E.2d 226 [ (1941) ] which is the subject of an annotation in 133 A.L.R. 1393 on the effect of non-use of a way of necessity. This rule is consonant with the generally held view that non-use alone is not sufficient to extinguish a way by necessity. *Knotts v. Summit Park Co.,* 146 Md. 234, 126 A. 280.

*Hancock,* 236 Md. at 104–05, 202 A.2d 599.

Thus, under *Hancock,* the easement of necessity need not be, at the time of the conveyance, physically or visually apparent, as the Purnells suggest. Indeed, there was no evidence in *Hancock* that the easement was in existence at the time of the 1898 conveyance.

This Court considered the meaning of "apparent" as used by the *Burns* Court in *Johnson v. Robinson,* 26 Md.App. 568, 338 A.2d 88 (1975). We wrote:

The Court of Appeals emphasized that a reservation would be implied only in extraordinary circumstances, *i.e.,* where there was clear evidence that despite the absence of an express designation in the deed, the parties intended that a right-of-way would be reserved. The rule was described by the Court in terms of the usual situation where both parties were aware prior to the deed's signing that the right-of-way was the grantor's sole means of access to his property, as well as that it was and must continue to be used by him. The parties' knowledge assured their aware-

---

tunity to present additional evidence. 184 Md. at 323, 41 A.2d 66. In *Condry v. Laurie,* 186 Md. 194, 199, 46 A.2d 196 (1946), the Court affirmed the Chancellor's finding that a way of necessity existed.

ness of "the real purport of their deeds" and created a "presumption of a reservation." We may conclude that the key criteria for the presumption are knowledge of the necessity and some sort of objective manifestation of the parties' intention to reserve a right-of-way. *It would thus appear that the Burns Court was not intending to espouse anything more than that the easement must be "apparent" for an implied reservation, serving as some notice or warning to the purchasing party that an easement may exist.*

In the reverse but analogous situation an implied grant will exist where the necessity of an easement for the benefit of a grantee is apparent to the grantor:

> "And that being so, by analogy to the well settled principle that all *apparent* easements or quasi-easements which are necessary to the reasonable enjoyment of the premises granted, and which have been and are at the time of the grant, used, or allowed to be used, by the owner of the entirety for the benefit of the part granted, will pass to the grantee by implication." *Burns,* 62 Md. at 474. [Emphasis added in part and deleted from original].

The same principle is applied in the quasi-easement situation. A "quasi-easement" is a legal fiction developed to overcome the premise in law that one cannot have an easement over one's own land. *When one utilizes a part of his land for benefit of another part and the land is separated without reservation or grant, a quasi-easement is implied. The phrase is no more than a convenient expression for an owner's utilization of one part of the land for the benefit of the other.* Tiffany Real Property, (3d ed.), § 781.

When the owner transfers the quasi-dominant portion of his land, it is said that the quasi-easement implied by law goes with it to the grantee on the presumption that the grantor and grantee *intended* and *expected* that it should pass. *The Courts merely declare that such an intention may be presumed from the apparent dependence of one piece of land upon the other.*

*Johnson,* 26 Md.App. at 576–78, 338 A.2d 88 (footnote and one citation omitted) (some emphasis supplied).

Moreover, " 'the rules regarding implied grants and implied reservations are both rules of construction.' " *Shpak,* 280 Md. at 363, 373 A.2d 1234 (quoting *Slear v. Jankiewicz,* 189 Md. 18, 24, 54 A.2d 137 (1947)). The *Shpak* Court relied on 3 H. Tiffany, *The Law of Real Property* § 781 (3d ed.1939) to explain:

"It has been stated that the moment a severance occurs by the sale of a part, the right of the owner to re-distribute the properties of the respective portions ceases and easements or servitudes are created corresponding to the benefits and burdens mutually existing at the time of the sale. This is not a rule for the benefit of purchasers, only, but is entirely reciprocal. Hence, if instead of a benefit conferred a burden has been imposed upon the portion sold, the purchaser, provided the marks of this burden are open and visible, takes the property with a servitude upon it. *The parties are presumed to contract in reference to the condition of the property at the time of the sale, and neither has a right, by altering arrangements then openly existing, to change materially the relative value of the respective parts.*

"It is perhaps unfortunate that the courts, in determining whether, in a particular case, an easement corresponding to a pre-existing quasi easement has passed with the land, have usually failed to recognize that the question is primarily one of construction, and have instead undertaken to lay down absolute rules as to what characteristics the particular easement or quasi easement must have, implying that, if it has these characteristics, the easement will pass as a matter of law. The characteristics ordinarily referred to in this connection are, as above indicated, that the user be apparent, that it be continuous, and that it be necessary, each of which will be hereafter discussed in turn. But it does not seem that the presence or absence of any or all of these characteristics should be conclusive. Taking the case of a quasi easement which is not apparent, which is not continuous and which is not necessary, nevertheless a conveyance

in terms of the quasi dominant tenement should, it is conceived, be construed as a conveyance of the lands with an easement appurtenant thereto corresponding to the pre-existing quasi easement, if this accords with the probable intention of the parties. On the other hand, even though the quasi easement has all the three characteristics named, an easement corresponding thereto evidently does not pass with the land if the language of the conveyance shows clearly an intention otherwise, or if the circumstances are such as to exclude a construction of the language of the conveyance as inclusive of the easement. So it has been decided that an easement does not pass when the grantee of the land knows that the grantor has no intention that it shall pass." *Id.* at 356–57, 373 A.2d 1234. (Emphasis added. Footnotes omitted.)

*See also Stansbury,* 390 Md. at 490–91, 495–96, 889 A.2d 403 (where access to a landlocked parcel was gained from a neighboring parcel, but there was no evidence of a pre-existing easement, such as a path, trail, or roadway, an easement by necessity arose where there had been unity of title, that unity was severed, and the easement was necessary at the time of the severance in order to allow the new owner access to the landlocked parcel).

Thus, we conclude that the easement need not be apparent in the sense that, as the Purnells claim, it must have a physical presence or mark upon the land discernable to those who pass by. Rather, the easement must be apparent in the sense that there must be some notice or warning that the easement is in existence. We find no fault with the trial court's rulings as to the apparent nature of the easement at the time of the severance of the property by the Harrisons in 1918, as it was apparent that the property retained by the Harrisons was landlocked.

### 3. Extinguishment by adverse use or abandonment

As their "fallback" position, the Purnells claim that, to the extent an easement existed over their property, it has been

extinguished by adverse possession or by abandonment.[5] They assert that for 50 years they have farmed the area where Beard & Bone seeks to establish an easement. They add that their property is posted with "no trespassing" signs and that there was no evidence before the circuit court that anyone had used the property to gain access to the Beard & Bone property during the last 50 years. The Purnells conclude that "[t]o the extent an easement was created in 1918, it has been extinguished by the Purnells' hostile, open, continuous, notorious, and exclusive actions that have been performed under claim of title or ownership for a period of over twenty years."

The Purnells further claim that the easement was abandoned due to non-use. They assert that Beard & Bone's predecessor in title demonstrated an intent to abandon the easement when, approximately 15 years earlier, they utilized a different adjacent property (the Widgeon property) to remove timber harvested from the Beard & Bone property. They rely also on the undisputed fact that the Beard & Bone property was marketed, and sold to Beard & Bone, as having no access to a public road.

Beard & Bone answers that the Purnells, who carry the burden of establishing adverse possession of the easement, failed to demonstrate how the farming of the land and the "no trespassing" signs constituted possession that is actual, open, notorious, exclusive, hostile, under claim of title or ownership, and continuous or uninterrupted for the 20–year statutory period.

Beard & Bone also states:

Additionally, the Purnells failed to demonstrate how [farming the land and posting no trespassing signs] constituted adverse possession of *only* the implied easement. The Purnells argument is nonsensical—essentially, their argument is that they and their predecessors-in-title possessed a

---

5. The Purnells emphasize that their argument concerning adverse possession of the easement was made in the alternative to their assertion that the easement did not exist.

*nonexistent* easement in an open, notorious, exclusive, and hostile manner and, therefore, the ***nonexistent*** easement has been extinguished.

As the lower court recognized, the Purnells "cannot possess property or an easement openly, notoriously, or in a hostile manner that they themselves assert never existed." The Purnells' contention that the easement by necessity has been extinguished by adverse possession is, as a result, without merit. (Footnotes omitted; citation omitted; emphasis in original).

Beard & Bone further claims that there was no evidence of abandonment, which must be decisive, clear, and unequivocal. It asserts that permission by the Widgeon interests allowing Beard & Bone's predecessor in title to cross that land to remove timber was not a decisive, clear, and unequivocal act evidencing intent to abandon the easement. Beard & Bone maintains that the Purnells presented no evidence of the prior owner's reasons for using the adjacent property to remove the timber. It further states that the advertisement listing the Beard & Bone property as having no access did not demonstrate an intent to abandon the easement.

In rejecting the Purnells' claims of abandonment and extinguishment by adverse possession, the trial court found:

As to the Purnell[s'] contention that [Beard & Bone's] claim is barred by adverse possession [or] abandonment ..., this Court is not persuaded. To prove a claim for adverse possession, the burden rests on the party asserting the claim to show possession of the claimed property for the statutory period of 20 years and such possession must be actual, open, notorious, exclusive, hostile, under claim of title or ownership, and continuous or uninterrupted. *Costello v. Staubitz,* 300 Md. 60, 66, 475 A.2d 1185, 1188 (1984). While the Purnell[s] testified that they had farmed their parcel for over 50 years and that they posted "no trespassing signs" on the property, [they] cannot possess property or an easement openly, notoriously, or in a hostile manner that they themselves assert never existed.

Likewise, the Purnell[s'] argument that [Beard & Bone] is barred by abandonment must fail. To prove abandonment, the Purnell[s] must show that the owner intended to abandon the easement. *Chevy Chase Land Co. v. U.S.,* 355 Md. 110, 161, 733 A.2d 1055, 1081 (1999). Mere non-use of the easement is insufficient to show intent to abandon. *Id.* at 159, 733 A.2d 1055. Moreover, there must be an act or a combination of acts that unequivocally demonstrates the party's intent to abandon the easement. *Id.* The Purnell[s] produced no evidence that any predecessor in title to [Beard & Bone's] parcel had ever taken any action to clearly indicate any intent to abandon any easement. As noted *supra,* the Purnell[s] argue that no easement ever existed. One cannot have their proverbial cake and eat it, too. Accordingly, this Court finds that there has been no showing that any predecessor in title took any affirmative action that would lead this Court to find that anyone clearly intended to abandon an easement, therefore, effectively insuring that they and all future title holders in [Beard & Bone's] parcel would have no means of access.

### Adverse Possession

 In *Costello v. Staubitz,* 300 Md. 60, 67, 475 A.2d 1185 (1984) (footnote omitted and citations omitted), the Court of Appeals explained:

To establish title by adverse possession, the claimant must show possession of the claimed property for the statutory period of 20 years. Such possession must be actual, open, notorious, exclusive, hostile, under claim of title or ownership, and continuous or uninterrupted. The burden of proving title by adverse possession is on the claimant.

 An easement may be obtained or extinguished by adverse possession. *USA Cartage v. Baer,* 202 Md.App. 138, 32 A.3d 88 (2011); *Read v. Montgomery County,* 101 Md.App. 62, 68–69, 643 A.2d 476 (1994); *see also* 3 H. Tiffany, *Real Property,* § 827 at 395 ("An easement may be extinguished by the user of the servient tenement in a manner adverse to the exercise of the easement for the period required to give title

to land by adverse possession. . . .") (Footnote omitted). The analysis of the adverse possession of an easement is not the same as that conducted for the adverse possession of land:

> The elements of adverse possession of land are very similar to the elements necessary to establish adverse possession of an easement. There is, however, an analytical distinction between the two categories of adverse possession. The owner of the servient estate claiming adverse possession of an easement already has the right to possess and use the land so long as that use is not inconsistent with the easement. Therefore, the owner of a servient estate must prove the use of the servient estate made during the period of adverse possession is sufficiently hostile and inconsistent with the use permitted by the easement.
>
> > To extinguish an easement over (or use of) the servient tenements, the servient tenement owner must demonstrate a visible, notorious and continuous adverse and hostile use of said land which is inconsistent with the use made and rights held by the easement holder, not merely possession which is inconsistent with another's claim of title.
>
> *Estojak v. Mazsa*, 522 Pa. 353, 562 A.2d 271, 275 (1989). Just as the creation of an easement by prescription is not favored in the law, the termination of an easement by adverse possession is not favored.

*Mueller v. Hoblyn*, 887 P.2d 500, 507 (Wy.1994) (some citations omitted). Further, "[a] narrow exception to the general rule that an easement may be extinguished by the adverse possession of the owner or possessor of the servient estate has evolved for easements that have not been definitively located through use." 3 H. Tiffany, *Real Property*, § 827 at 308 (2011–12 Supp.).

Although our research has revealed no Maryland case applying this exception, it has been applied by our sister states. A modern-day discussion of the exception can be found in *Castle Assocs. v. Schwartz*, 63 A.D.2d 481, 407 N.Y.S.2d 717 (N.Y.App.Div.1978). There, the New York Appellate Division

held that an easement created by grant, but never located, *i.e.,* a "paper" easement, could not be extinguished because the owner of the easement had never demanded that the easement be opened. *Id.* at 723. The Court concluded:

[W]here an easement has been created but no occasion has arisen for its use, the owner of the servient tenement may fence his land and such use will not be deemed adverse to the existence of the easement until such time as (1) the need for the right of way arises, (2) a demand is made by the owner of the dominant tenement that the easement be opened and (3) the owner of the servient tenement refuses to do so.

*Id.*

Later, the Court of Appeals of New York recognized the exception in *Spiegel v. Ferraro,* 73 N.Y.2d 622, 543 N.Y.S.2d 15, 541 N.E.2d 15 (1989), and explained:

The theory underlying the exception is that easements not definitively located and developed through use are not yet in functional existence and therefore the owner of the easement could not be expected to have notice of the adverse claim until either the easement is opened or the owner demands that it be opened. It is only at such point, therefore, that the use of the easement by another is deemed to be adverse to the owner and the prescriptive period begins to run. So understood, the exception is consistent with the general theory of adverse possession— "that the real owner may, by unequivocal acts of the usurper, have notice of the hostile claim and be thereby called upon to assert his legal title[.]"

*Id.* at 626, 543 N.Y.S.2d 15, 541 N.E.2d 15 (quoting *Monnot v. Murphy,* 207 N.Y. 240, 100 N.E. 742, 743 (1913)) (some citations omitted); *see also Sabino Town & Country Estates v. Carr,* 186 Ariz. 146, 920 P.2d 26, 30 (1996) (where deeded easement had not been developed, needed, or used, servient owner's fencing of easement was not adverse); *Matoush v. Lovingood,* 177 P.3d 1262, 1273–75 (Co.2008) (servient owner's use of easement, which had been expressly created, was not

adverse until owner of dominant estate needed to use the easement); *Kolouch v. Kramer*, 120 Idaho 65, 813 P.2d 876, 879–80 (1991) (deeded easement not extinguished by adverse possession where owner of servient estate placed six trees down center of easement, constructed fence inside easement boundaries, constructed a concrete irrigation diversion at one end of the easement, and placed several large boulders within the easement; easement had never been used and owner of servient estate was "entitled to use his land . . . for any purpose not inconsistent with the purpose reserved in the easement"); *Pearson v. Virginia City Ranches Ass'n*, 298 Mont. 52, 993 P.2d 688, 696 (2000) (erection of fence across easement, which had been referenced in deeds, was not adverse until the owners of the dominant tenements demanded that the obstruction be removed and the owners of the servient tenement refused to do so); *Edmonds v. Williams*, 54 Wash.App. 632, 774 P.2d 1241, 1244 (1989) (where no effort made to use deeded easement, servient owner's construction of fence over easement was not adverse); *Mueller*, 887 P.2d at 509 (where recorded easement had never been developed or used, no portion of the easement had been terminated by adverse possession).

In contrast to the cases discussed, *supra*, we are concerned with an implied easement by necessity, not an express or deeded easement. We believe, however, that the reasoning of those cases is sound and that it should be likewise applied to situations where the easement is created by implication or necessity, as in the present case. We reach this conclusion for several reasons. First, an easement passes with each conveyance to subsequent grantees. *Hancock*, 236 Md. at 105, 202 A.2d 599. Thus, "a remote grantee of land not being used at the time of severance may nevertheless, when the use becomes necessary to the enjoyment of his property, claim the easement under his remote deed." *Id.* (citation omitted). Second, "[e]asements by necessity normally cease to exist when the necessity for the easement ceases." *Stansbury*, 390 Md. at 491, 889 A.2d 403 (citation omitted). In the instant case, the necessity has not been extinguished, that is, the

Beard & Bone property remains landlocked. Third, the public policy supporting easements by necessity, *i.e.*, the full utilization of land. Finally, in *Orfanos Contractors v. Schaefer*, 85 Md.App. 123, 136, 582 A.2d 547 (1990), we again noted that "[t]he rules regarding the creation of easements of necessity . . . are rules of construction for determining the scope of the conveyance." We added: "From a legal point of view, it is immaterial whether the easement was passed by an express grant in the conveyance or whether the circumstances call for a construction of the conveyance to create a grant." *Id.* (citation omitted).

As a result, we hold that the Purnells could not adversely possess the easement until such time as Beard & Bone sought to locate, develop, and use the easement. Only after Beard & Bone sought to open the easement, and the Purnells denied the use, could the prescriptive period begin to run.

### Abandonment

"The burden of proving abandonment rests on the one who asserts or relies on it . . . [and] the law is well settled that the intent to abandon may be shown by the acts of a party indicating such an intention." *Read,* 101 Md.App. at 73, 643 A.2d 476 (quoting *Maryland & Pa. R.R. v. Mercantile–Safe Deposit & Trust Co.,* 224 Md. 34, 40, 166 A.2d 247 (1960)) (citations omitted). In *Vogler v. Geiss,* 51 Md. 407, 410 (1879) (citations omitted), the Court of Appeals set forth the standard by which to measure whether an easement has been abandoned:

It is now very well settled, by authorities of the highest character, that a party entitled to a right of way or other mere easement in the land of another may abandon and extinguish such right by acts *in pais,* and without deed or other writing. The act or acts relied on, however, to effect such result, must be of a decisive character; and while a mere declaration of an intention to abandon will not alone be sufficient, the question, whether the act of the party entitled to the easement amounts to an abandonment or not, depends upon the intention with which it was done, and that

is a subject for the consideration of the jury. A cesser of the use, coupled with any act clearly indicative of an intention to abandon the right, would have the same effect as an express release of the easement, without any reference whatever to time.

*See also Chevy Chase Land Co. v. United States*, 355 Md. 110, 159, 733 A.2d 1055 (1999) ("non-use alone is insufficient to show an intent to abandon; there must be an act or a combination of acts that unequivocally demonstrate an intention to abandon") (citations omitted); *Shuggars v. Brake*, 248 Md. 38, 46, 234 A.2d 752 (1967) ("An easement may not be lost unless there is some act clearly and unequivocally indicating an intention to abandon it, and mere non-user is not enough."); *Cooper v. Sanford Land Co.*, 224 Md. 263, 266, 167 A.2d 602 (1961) ("Two elements are necessary to show an abandonment, namely, an intention to abandon, and an overt act, or an omission to act, by which such intention is carried into effect.") *But see Stewart v. May*, 119 Md. 10, 19, 85 A. 957 (1912) (easement abandoned where holder of the easement had not used it for "at least twelve years" and, *inter alia*, "had built over the [easement] in such way as to make it impossible for them to enjoy [the easement]"); *Duval v. Becker*, 81 Md. 537, 32 A. 308 (1895) ("The mere cessor of use for a long space of time would be a strong fact to show an intention to abandon the right. . . .")

The record before us reveals that the Purnells presented evidence that they had farmed their property for 50 years, and that a drainage ditch existed where Beard & Bone sought to place the easement. There was, however, no evidence of any intention or overt act by Beard & Bone, or by any of Beard & Bone's predecessors in title, to abandon the easement. The evidence does not support a conclusion that the use of the Widgeon property to facilitate a one-time timbering operation constituted such an act. Again, we have no dispute with the trial court's finding that the easement had not been lost to abandonment.

### 4. Laches

██ Lastly, the Purnells assert that to the extent that an easement arose in this case, it did so in 1918, but for more than 90 years no action was taken to identify, delineate, or use the easement. They add that during that time period, they and their predecessors in title have improved the property and constructed drainage ditches in the precise area where Beard & Bone now seeks to locate an easement.

The Purnells also argue that there are likely no witnesses still alive with any knowledge of the historic uses of the properties in question. They conclude that they have been prejudiced by the failure of Beard & Bone and its predecessors in title to diligently pursue their claims. The Purnells assert that because of the substantial delay in asserting the easement rights, and the prejudices caused to them, the trial court erred as a matter of law when it failed to find that Beard & Bone's claims are barred by the doctrine of laches.

Beard & Bone respond that the Purnells made no showing of prejudice sufficient to meet the requirement of laches. According to Beard & Bone, demonstrable prejudice must be either in the form of evidence lost due to the delay that would support the opposing parties' position, or that the opposing party changed his position in a way that would not have occurred without the delay. Beard & Bone claim that the Purnells' assertion that improvement of the property and construction of a drainage ditch falls short of this standard. It further alleges that the Purnells presented no evidence that, had the delay in asserting the existence of the easement not occurred, the Purnells would not have constructed the drainage ditch. Beard & Bone adds that the Purnells failed to identify potential lost witnesses, or to proffer what those lost witnesses would have testified to.

The Purnells respond that the record identifies the lost witnesses, *to wit,* the various individuals identified in the chain of title. They conclude that "[w]aiting over 100 years to assert rights to a claimed easement constitutes laches as a matter of law."

In denying the Purnells' claim under the doctrine of laches, the trial court wrote:

> As to the Purnell[s'] remaining argument that [Beard & Bone] is barred by the doctrine of laches, this Court is not swayed. The doctrine of laches applies when, by an unreasonable delay in the assertion of one's rights, the opposing party suffers prejudice. *Liddy v. Lamone,* 398 Md. 233, 244, 919 A.2d 1276, 1283 (2007). No one produced any evidence as to how long [Beard & Bone's] predecessors in title may have been utilizing the Widgeon's property for ingress and egress. Furthermore, no one can state with any certainty when the need for an easement by necessity arose, beyond the initial implied necessity when the parcels were severed. [Beard & Bone] has only owned the parcel at issue since February 22, 2007 and brought this action on June 13, 2008. Certainly, [Beard & Bone] realized an issue with access existed and attempted to work things out outside of the courtroom prior to instituting this instant action, even approaching the Widgeons concerning prior access by [Beard & Bone's] predecessor in title. Therefore, the Court does not find that there was an unreasonable delay in [Beard & Bone] asserting its rights to an easement by necessity.

 "Laches 'is a defense in equity against stale claims, and is based upon grounds of sound public policy by discouraging fusty demands for the peace of society.'" *Ross v. State Bd. of Elections,* 387 Md. 649, 668, 876 A.2d 692 (2005) (quoting *Parker v. Board of Election Supervisors,* 230 Md. 126, 130, 186 A.2d 195 (1962)). "[T]here is no inflexible rule as to what constitutes, or what does not constitute, laches; hence its existence must be determined by the facts and circumstances of each case." *Parker,* 230 Md. at 130, 186 A.2d 195 (citations omitted). In *Liddy v. Lamone,* 398 Md. 233, 244–45, 919 A.2d 1276 (2007) (some citations omitted), the Court of Appeals set forth the doctrine of laches:

> It is . . . well settled that laches "applies when there is an unreasonable delay in the assertion of one's rights and that delay results in prejudice to the opposing party." *Frederick*

*Road Ltd. Partnership v. Brown & Sturm,* 360 Md. 76, 117, 756 A.2d 963, 985 (2000), citing *Inlet Assoc. v. Assateague House Condominium Ass'n,* 313 Md. 413, 438–39, 545 A.2d 1296, 1309 (1988); *See* [*Ross v. State Bd. of Elections,* 387 Md. 649, 669, 876 A.2d 692, 704 (2005)] ("[L]aches must include an unjustifiable delay and some amount of prejudice to the defendant"); *Schaeffer v. Anne Arundel County,* 338 Md. 75, 83, 656 A.2d 751, 755 (1995) ("[L]aches is an inexcusable delay, without necessary reference to duration in asserting an equitable claim") (emphasis in original); *Simpers v. Clark,* 239 Md. 395, 403, 211 A.2d 753, 757 (1965) ("[F]or the doctrine [of laches] to be applicable, there must be a showing that the delay [in the assertion of a right] worked a disadvantage to another"); *Hungerford v. Hungerford,* 223 Md. 316, 320–21, 164 A.2d 518, 521 (1960) ("Only two requisites are necessary in order to invoke the doctrine of laches. There must have been some lapse of time during which plaintiff failed to assert his rights, and the lapse must have caused some prejudice to the defendant"). Prejudice is "generally held to be any thing that places [the defendant] in a less favorable position." *Ross,* 387 Md. at 670, 876 A.2d at 704, quoting *Buxton v. Buxton,* 363 Md. 634, 646, 770 A.2d 152, 159 (2001)....

This Court has also explained the doctrine:

"Laches is a defense in equity against stale claims; the word, itself, derives from the old French word for laxness or negligence." *Buxton v. Buxton,* 363 Md. 634, 645, 770 A.2d 152 (2001). "There is no inflexible rule as to what constitutes, or what does not constitute, laches; hence its existence must be determined by the facts and circumstances of each case." *Parker v. Board of Election Supervisors,* 230 Md. 126, 130, 186 A.2d 195 (1962). The passage of time, alone, does not constitute laches but is simply "one of the many circumstances from which a determination of what constitutes an unreasonable and unjustifiable delay may be made." *Id.* Even if an impermissible delay is present, if the delay "has not prejudiced the party asserting the defense, it will not bar the equitable action." *Schaeffer v. Anne Arun-*

*del County,* 338 Md. 75, 656 A.2d 751 (1995). "Since laches implies negligence in not asserting a right within a reasonable time after its discovery, a party must have had knowledge, or means of knowledge, of the facts which created his cause of action in order for him to be guilty of laches." *Parker,* 230 Md. at 131, 186 A.2d 195.

*Greenfield v. Heckenbach,* 144 Md.App. 108, 142 n. 11, 797 A.2d 63 (2002).

There was no evidence before the circuit court of any negligence or unreasonable delay on the part of Beard & Bone or any of its predecessors in title. This follows because there is no evidence that the easement was needed until Beard & Bone purchased the property in 2007. The evidence demonstrated that the prior owner gained access to the Beard & Bone property via the Widgeon property which, as we have held, did not extinguish the easement. As a result, based on the evidence presented at trial, when Beard & Bone was unable to gain access through the Widgeon property, it timely filed the present action.

There is nothing in the record that would support a conclusion that Beard & Bone, or their predecessors, slept on their rights, vis a vis, the easement. The trial court did not err in denying the Purnells' claim under the doctrine of laches.

In sum, we hold that: the evidence was sufficient to establish an easement of necessity or implication in favor of Beard & Bone across the property of the Purnells; the circuit court did not err in the location of the easement; that the easement was neither abandoned nor extinguished by adverse possession; and that Beard & Bone's claim was not barred by laches.

**JUDGMENTS OF THE CIRCUIT COURT FOR WORCESTER COUNTY AFFIRMED; COSTS ASSESSED TO APPELLANTS.**